UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:20CR54 RLW(SPM) |
| | ) |
| ALFORD BUFORD | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION AND**
**MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE**

This matter was referred to the undersigned United States Magistrate Judge for all pretrial matters pursuant to 28 U.S.C. §636(b).

### INTRODUCTION

Currently before the Court is Defendant Alford Buford's Motion to Suppress Physical Evidence (Doc. 28). Buford contends methamphetamines and a firearm seized from a pickup truck he was driving at the time of his arrest were the fruit of an unconstitutional traffic stop. Buford also contends that even if the initial stop was lawful, he was detained beyond the time necessary for the officer to complete the tasks related to the traffic stop without reasonable suspicion of criminal activity. For the reasons set out below, I find that neither the initial stop nor the officer's subsequent detention of Buford violated the Constitution. As such, I recommend that Buford's Motion to Suppress Physical Evidence be denied.

### PROCEDURAL BACKGROUND

On March 10, 2020, Defendant Alfred Buford was charged in a criminal complaint with possession with intent to distribute 500 grams or more of methamphetamine (Count 1) and

possession of a firearm in furtherance of drug trafficking (Count 2). Buford appeared for an Initial Appearance before the Honorable Abbie Crites-Leoni on March 11, 2020. On March 16, 2020, a grand jury returned an indictment charging Buford with the same crimes alleged in the complaint. Buford, through counsel, waived personal appearance at an arraignment and entered a plea of not guilty to the indictment on March 24, 2020. Following the arraignment, Judge Crites-Leoni entered a scheduling order ordering, among other things, that any pretrial motions be filed on or before May 11, 2020. On March 24, 2020, the case was reassigned to the undersigned for all further pretrial matters. On May 11, 2020, Buford's attorney filed the instant motion to suppress physical evidence, and the undersigned entered an order granting the United States time, through May 26, 2020, to file a response to the motion. On May 26, 2020, in compliance with the undersigned's order, the United States filed a response opposing Buford's motion. (Doc. 31). After conferring with counsel for both parties, and with the consent of Buford, the undersigned held an evidentiary hearing, via Zoom video conferencing, on June 24, 2020.

At the hearing, the United States offered testimony of Officer Eric Bennett as well as a video recording from a camera inside of Officer Bennett's patrol car. The United States also offered statistical reports from the Missouri State Highway Patrol. In addition to cross examining Officer Bennett, Buford offered the Affidavit of Kadijah Kinds,[1] an incident report of the events surrounding Buford's arrest, and social media postings by Officer Bennett from 2014, May 2020, and June 2020. At the close of the hearing, the parties requested, and were granted, time to request a transcript of the hearing and to file post-hearing briefs. Post-hearing briefing was completed on July 30, 2020. After carefully considering the evidence presented at the hearing, the written

---

[1] The United States consented to Ms. Kinds testifying by way of Affidavit. *See* Hrng. Tr. (Doc. 48), p. 7.

submissions of the parties, and the applicable law, I make the following findings of fact and conclusions of law.

### FINDINGS OF FACT

On the morning of March 6, 2020, shortly after 11:30, Officer Eric Bennett with the Missouri State Highway Patrol ("MSHP") pulled Defendant Alfred Buford over on Interstate 55, near marker 86. Bennett, who was driving a marked highway patrol car, was parked on or near the northbound lanes. Bennett first noticed Buford's truck as it approached his patrol car from behind. According to Bennett, the truck slowed down to a speed slower than the normal flow of traffic before passing his patrol car. Bennett testified that, because of the position of the driver's seat, the driver was partially obscured, and he was unable to observe either the race or gender of the driver of the truck as it passed.

Bennett was driving a marked highway patrol car equipped with a camera that automatically begins recording when the lights on the patrol car are activated. Bennett was also equipped with a microphone connected to the camera. As such, the exchange between Buford and Bennett was recorded by video and audio beginning from the time Bennett activated the lights on his patrol car. The recording of the interaction was accepted into evidence as Government's Exhibit 1. Officer Bennett's hearing testimony and other evidence presented at the hearing was largely consistent with the video recording.

Buford was driving a black pickup truck with Maryland license plates. A barcode sticker on the windshield together with the absence of a license plate holder and dealer decals indicated to Bennett that the truck was a rental vehicle. Bennett approached the truck on the passenger side and was able to observe through the opened passenger-side window that Buford was the sole occupant. Bennett noticed a very strong odor of air freshener. Bennett asked Buford for his

3

driver's license and the registration or rental agreement. Buford handed Bennett his driver's license and a rental agreement he retrieved from the glove compartment. Bennett then asked Buford to accompany him back to his patrol car explaining it would be quieter and safer. Buford complied.

Buford and Bennett entered the patrol car around 11:38. Almost immediately after Buford and Bennett entered the patrol car, Bennett explained he stopped Buford because he had observed Buford cross the dashed center line and swerve into the other lane without signaling, which is a traffic violation in Missouri.  Buford appeared to concede it was possible Bennett saw him swerve across the center lane, indicating he had been fiddling with the radio. Buford apologized for the infraction. Bennett stated it was "no big deal" and told Buford he would issue a warning and "get him on his way." Bennett then began entering information into a computer in his patrol car while simultaneously asking Buford questions about his trip.  Specifically, Bennett ran Buford's name and information and confirmed he had no active warrants. Bennett also check the vehicle information and received no information it was reported stolen. Bennett then proceeded to input information into the in-car computer system necessary to enter a warning for the traffic violation.

MSHP officers like Bennett issue warning tickets by collecting information from the driver and entering it into their in-car computer system. There are 46 different fields to fill out to complete that task.  By Bennett's estimation, the process of running the motorist's name and driver's license information, checking on the registration of the vehicle and entering the information required for a warning ordinarily takes between ten to twelve minutes.

Soon after Bennett began entering the warning information into the car computer system, he appeared to notice a discrepancy between information Buford provided (Buford's driver's

4

license, for example) and the rental agreement. The rental agreement indicated the truck had been rented from Enterprise Leasing by someone named "Tonnie Brown" and had been due back to Enterprise in January. Bennett asked Buford about his relationship with "Tonnie Brown," and pointed out that the rental agreement Buford had given him showed the truck had been rented in December 2019 and had been due back in January 2020. Buford acknowledged he did not know Tonnie Brown. He explained his girlfriend, Kadijah, had rented the truck. Buford speculated that Kadijah likely had the current rental agreement and the agreement he handed Bennett was likely an agreement from a prior rental. Around 11:42, Bennett asked Buford if he was an "authorized" driver. Buford stated he was not sure.

These discrepancies related to the rental agreement appeared to raise Bennett's suspicions and he started to press Buford more closely about the details of his travels and the circumstances surrounding the truck rental. In response to Bennett's questions, Buford explained, among other things, that his girlfriend had rented the truck 4-5 weeks prior; that his girlfriend had no connection to the person whose name appeared on the rental agreement; that he borrowed the truck from his girlfriend to visit his mother in Iowa; that although his driver's license listed an Iowa address he moved to Memphis – where his trip originated—six months ago and had not yet gotten a Tennessee license. During this exchange, Bennett continued entering information such as Buford's age into his computer.

Buford asked if he'd be able to make a phone call, to which Bennett responded, "we'll see." Bennett—who appeared to continue to be suspicious—asked Buford why his girlfriend, the authorized driver, was not traveling with him. Buford explained that his girlfriend was back in Tennessee with his son. Bennett—apparently unsatisfied with this explanation—pressed Buford by inquiring further into the subject. Around 11:47, Bennett advised Buford that he may

5

not be allowed to drive the rental truck if he is not an authorized driver and Enterprise (the owner of the truck) would "more than likely" want him to tow the truck.

At that point, Buford asked Bennett to give him "a break" and admitted that he was likely not listed as an authorized driver but his girlfriend could probably add him as an authorized driver. At 11:48, Bennett asked Buford if there was anything illegal in the truck. Bennett told Buford, in words or substance, that based on the third-party rental and "other indicators" he was observing, Buford's situation was similar to other situations that, in his experience, involved illegal activity. Buford denied there was anything illegal in the truck but declined to consent to Bennett searching the truck stating "I do not consent to searches."

At the hearing, Bennett explained that the "other indicators" that raised his suspicion included the fact that Buford drove slower than the flow of traffic after passing Bennett on the interstate, the heavy scent of air freshener inside the rental vehicle (which was quite clean and did not appear to need such a heavy fragrance), the fact that Buford was driving from a city known as a source city for narcotics, and Buford's excessive nervousness as he was speaking with Bennett inside the patrol car.

Bennett decided to call for a K-9 unit to perform a dog-sniff, and at approximately 11:50 he advised Buford accordingly. In doing so, Bennett advised Buford he did not have to consent to the K-9 sniff and Buford was "not free to go yet." At approximately 11:53, Bennett contacted a K-9 unit and indicated the unit would arrive in about 10 minutes. Bennett indicated that was fine as he (Bennett) was still entering information for the warning into his computer.

After calling for the K-9 unit, Bennett called Enterprise to inquire about the rental. When Buford learned that Bennett was calling Enterprise he indicated (for the first time) that he knew "for a fact" that he was not listed as an authorized driver. Bennett called anyway. When Bennett

6

finally spoke to a representative (around 12 noon), the representative corroborated information provided by Buford regarding the location of the rental (Hornlake, Mississippi), the date of the rental, and the name of the renter (Ms. Kinds). The Enterprise representative also confirmed that Buford was not an authorized driver of the rental and that Enterprise was going to want to get its truck back. Bennett indicated that they had "some other things going on" and stated he would call Enterprise back in about fifteen to twenty minutes. In sum, by approximately 12:02, Bennett made clear that he intended to detain the rental truck until Enterprise retrieved it and intended to detain Buford until a drug sniffing dog performed an exterior "sniff" search of the rental truck.

The K-9 unit arrived at about 12:18 on the patrol car recording, approximately 40 minutes after the initiation of the traffic stop. The deputy ran his dog around the pickup truck then came back to the patrol car and informed Bennett that the dog alerted to the driver's side of the truck.  Bennett gave that information to Buford and asked Buford if he had any questions for the handler about the dog. Buford did not have any questions.

Bennett searched the truck based on the dog alert. He found a bag behind the driver's seat that contained approximately two pound of a substance he believed to be methamphetamine. He also found a pistol under the driver's seat. Those items were seized, and Buford was placed under arrest around 12:22.

### CONCLUSIONS OF LAW

In moving to suppress the seized items, Buford challenges both the initial stop and Bennett's decision to detain him until a dog sniff of the truck could be conducted.[2] Buford's challenge to the initial stop appears to rest on two separate and, presumably, alternative

---

[2] Buford does not appear to contend that Bennett lacked probable cause to search the car once the dog alerted to the presence of narcotics. As such, this Report & Recommendation examines only whether delays leading up to the dog sniff violated the Fourth Amendment.

arguments. Although it is not entirely clear, Buford's first argument appears to be that the initial stop was unconstitutional because Bennett fabricated a traffic violation as a pretext for a racially motivated traffic stop. In the alternative, Buford argues the initial stop was not constitutionally reasonable because the violation alleged by Bennett—crossing the dotted line without signaling—was not a traffic violation that would justify a traffic stop. Finally, Buford contends that even if the initial stop was valid, Bennett violated the Fourth Amendment by unreasonably extending the stop without reasonable suspicion for doing so. The undersigned will address each of Buford's arguments in turn.

### A.  BUFORD FAILED TO ESTABLISH A CONSTITUTIONAL VIOLATION BASED ON RACE

In both his opening brief and at the evidentiary hearing, Buford appeared to argue that the initial stop was unreasonable, for Fourth Amendment purposes, because it was racially motivated, and Bennett fabricated the violation as a pretext for the traffic stop. Although Buford appears to frame the issue as one arising under the Fourth Amendment, in *Whren v. United States,* the Supreme Court held that while it is decidedly constitutionally impermissible for police to decide which motorists to stop based on the race of a car's occupants, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." 517 U.S. 806, 813 (1996). Indeed, the Eighth Circuit has held the Equal Protection Clause of the Constitution "prohibits selective enforcement of the law based on considerations such as race," and "encounters with officers may violate the Equal Protection Clause when initiated solely based on racial considerations." *United States v. Frazier,* 408 F.3d 1102, 1108 (8th Cir. 2005).

To establish such a constitutional violation, a defendant must prove "both discriminatory effect and discriminatory purpose." *Johnson v. Crooks*, 326 F.3d 995, 1000

8

(8th Cir. 2003) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). *See also United States v. Abdow*, Case No. 09-292 JMR/SRN, 2010 WL 1839316, *7 (D. Minn. Feb. 22, 2010) (holding defendant arguing he was stopped because of his race "must show that similarly situated individuals of a different race were not stopped" in order to establish discriminatory racial profiling). "In a pre-contact context, . . . a defendant can prove a prima facie equal protection claim with direct evidence that the officer's decision to stop or to investigate the defendant was motivated by race." *United States v. Andrews*, Case No. 8:05CR139, 2005 WL 4753403, *3 (D. Neb. Nov.1, 2005) (citing *Frazier*, 408 F.3d at 1108). A finding that there was no probable cause for Fourth Amendment purposes may be considered "along with evidence of an officer's behavior during the events in question and the officer's own testimony." *Id.* And, "[t]o the extent they are reliable, statistics may be used to evaluate whether the officer's 'pattern' of traffic stops and arrests raises an inference of racial discrimination or tends to prove that similarly situated members of non-minority groups were treated better." *United States v. Hare*, 308 F.Supp.2d 955, 992 (D. Neb. 2004) (citation omitted). "While statistics alone will rarely be sufficient to prove racially discriminatory conduct, personal accounts of actual discrimination or the effects of discriminatory practices may complement this empirical evidence and bring 'cold numbers convincingly to life.'" *Id.* (quoting *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 339 (1977)).

In this case, Buford did not explicitly assert that Bennett violated the Equal Protection Clause. However, at the evidentiary hearing, defense counsel offered Trooper Bennett's Twitter post responding to an NAACP post regarding police abuse directed to "blacks in Ferguson" and Bennett's Facebook posts regarding media coverage of policing tactics in communities of color and the death of George Floyd in support of his argument that Bennett fabricated the traffic

9

violation. *See* Deft. Exs. B, C, D & E. Although defense counsel did not explicitly invoke the Equal Protection Clause, when the undersigned asked defense counsel why these exhibits were relevant, counsel responded:

> You have no evidence that my client indeed committed this traffic violation, other than the testimony of this particular trooper, okay, who on a daily basis goes out and risks his life on our behalf, and for that I am grateful. But if you were to conclude that this individual had a racial bias and instead pulled over my client because of the fact that he was African-American, then that's important.
>
> Because if you conclude that it really is not reasonable that he would select this individual because he went over the center line about a foot one time, and then, in fact, because of everything that we are finding out about his history, both past and current, would suggest that he does have that racial bias, then you have the difficult job of deciding whether or not he is credible, could conclude that that absolutely had no reason for his stop, that his stop was for a totally different reason.
>
> And that is because my client was traveling from Memphis, Tennessee or had a license plate from Tennessee and was African-American. That's the reason why.

ECF Doc. 48, p. 56-57.

While Bennett's social media postings might support a finding that he harbored some racial bias, when those postings are considered together with the other evidence presented, the evidence in this case falls far short of evidence that Bennett initiated this particular traffic stop because of Buford's race.

For instance, Bennett testified that because of the position of the driver's seat as Buford's truck drove by, he was unaware of the race or gender of the driver before he pulled over the pickup truck. Although Bennett conceded that he had seen enough of the driver to observe the driver's hairstyle, the evidence of record is muddled, at best, and does not affirmatively establish

10

that Bennett knew Buford's race before the stop.

The United States also presented data from the MSHP regarding Bennett's traffic stops during the year preceding the stop and during the week of the traffic stop. This evidence was also equivocal.  The data reflects that during the week Bennett stopped Buford, approximately 55% of the traffic stops by Bennett were of black motorists and 37.03% were of white motorists. *See* Govt. Ex. 2.  However, data for the year preceding the traffic stop shows that, over the course of a year, 32.4% of all traffic stops by Bennett were of black motorists and 62.5% of stops by Bennett were of white motorists. *See* Govt. Ex. 3.  Although defense counsel asked Bennett some questions about this data, there was no expert testimony or other information provided to the Court to explain or otherwise contextualize the information.

Finally, at the hearing, Bennett testified he initiated the traffic stop after observing Buford's truck slow down as it approached his patrol car, then drift across the center line into the left lane without signaling and then swerve back into the right lane. As Buford has noted, Bennett's observations of the alleged traffic violation were not captured by the video recording. However, Bennett's discussion with Buford shortly after Buford was pulled over *was* recorded. The video recording of Bennett's post-stop interactions with Buford supports, and is consistent, with Bennett's hearing testimony. On the recording, almost immediately after Buford and Bennett entered the patrol car, Bennett explained to Buford why he stopped him. Bennett also described what he observed and explained that although Buford was not speeding, he had violated Missouri law. Buford did not immediately deny that he had crossed the center line without signaling. Instead, he conceded he may have been distracted indicating he was definitely "fiddling" with the radio. Bennett's description of the alleged violation was credible and supported by the video recording presented.  As such, I credit and accept Bennett's testimony

11

that he observed Buford cross into the left lane without signaling; and, for the reasons more fully set out below, I find that based on this observation, Bennett had probable cause to believe Buford committed a traffic violation.

In sum, Buford has not properly asserted a violation under the Equal Protection Clause based on discriminatory racial profiling. Even if Buford did properly raise such a claim, for all of the foregoing reasons, such a claim is not supported by the evidence of record.

### B. THE VIOLATION DESCRIBED BY BENNETT FURNISHED PROBABLE CAUSE FOR A TRAFFIC STOP

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well established that "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Whren v. United States,* 517 U.S. 806, 809-10 (1996)). "An automobile stop is thus subject to the constitutional imperative that it not be unreasonable under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810.

In this case, Buford argues that, under Missouri law, "merely crossing a fog or divider line, without more, is not probable cause to initiate a traffic stop." *See* ECF Doc. 28, p. 5. In response, the United States cites the following Missouri traffic laws in support of its argument that Bennett had probable cause for the stop:

> Upon all public roads or highways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:
> (1) When overtaking and passing another vehicle proceeding in the same

12

> direction pursuant to the rules governing such movement;
> (2) When placing a vehicle in position for and when such vehicle is lawfully making a left turn in compliance with the provisions of sections 304.014 to 304.025 or traffic regulations thereunder or of municipalities;
> (3) When the right half of a roadway is closed to traffic while under construction or repair;
> (4) Upon a roadway designated by local ordinance as a one-way street and marked or signed for one-way traffic.

Mo. Rev. Stat. § 304.015.2. (2010)

> All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs, or signals.

Mo. Rev. Stat. § 304.015.6. (2010).

> 1. No person shall stop or suddenly decrease the speed of or turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after giving of an appropriate signal in the manner provided herein.
>
> (4) The signals herein required shall be given either by means of hand and arm or by a signal light or signal device . . .

Mo. Rev. Stat. § 304.019 (1996).

In this case, the only traffic law cited by the United States that appears relevant is section 304.019, which prohibits "moving right or left upon a roadway" without giving an appropriate signal.[3] According to Bennett's testimony, Buford allegedly crossed over the dotted line dividing

---

[3] The other provisions cited by the United States appear to require motorists to "drive" in the right-hand lane or right half of a roadway unless specifically described circumstances exist; they do not address whether a motorist must or must not signal. Based on Bennett's testimony that Buford moved, on a single occasion, momentarily and only partially into the left-hand lane without signaling, it would have been unreasonable, for Fourth Amendment purposes, to construe Bennett's observation as a violation of Mo. Rev. Stat. §§304.015.6. and 304.015.2. *See, e.g., United States v. Magallanes,* 730 F.Supp.2d 969, 976 (D. Neb. 2010) (where vehicle was not "driving" on shoulder of highway but only momentarily crossed over shoulder line, officer did not have objectively reasonable belief defendant violated the law).

13

two lanes of traffic into the left lane, without signaling, and then swerved back into the right-hand lane. Based on Bennett's testimony, it was the act of crossing into the left lane without signaling that led Bennett to believe there was a traffic violation. As noted above, although it was after-the-fact, the video recording of the interaction between Bennett and Buford after Buford was pulled over bolstered Bennett's testimony regarding the reasons for the stop. As such, based on the evidence presented, it was objectively reasonable for Bennett to believe Buford had committed a traffic violation under Missouri law by failing to signal when Bennett saw Buford cross into the left lane without signaling.

### C. THE TRAFFIC STOP WAS NOT UNREASONABLY PROLONGED

By Bennett's own estimation, absent delays or interruptions, it would typically take no more than twelve minutes for him to complete the tasks associated with issuing a warning to a motorist. Buford and Bennett entered the patrol car around 11:38; so, in the absence of any delays, the tasks reasonably related to entering a warning would have theoretically been completed by 11:50. However, as the foregoing factual findings demonstrate, Bennett made two decisions during the stop that significantly extended that process. First, at 11:50, Bennett called for a K-9 unit to conduct a dog sniff around the exterior of the truck. Next, around 12 noon, Bennett contacted Enterprise—the truck rental company—to verify the third-party rental information provided by Buford. The undersigned will address each of these decisions in turn.

#### 1. *Bennett's call to Enterprise was related to the initial stop.*

As the foregoing factual findings demonstrate, Bennett decided to contact Enterprise after learning the following: Buford, the sole occupant of the truck, was not the person on the rental agreement; the person Buford identified as the renter of the truck was also not listed on the rental agreement; according to the rental agreement, the truck had been due back to Enterprise Leasing

14

two months earlier; and Buford was "not sure" if he was an authorized driver. Based on his prior experience, Bennett advised Buford that the rental company would likely not permit Buford to keep possession of the truck if Buford was not an authorized user. Although Buford indicated he could resolve the issue by making a call to his girlfriend—the person on the rental agreement—Bennett declined to give Buford an opportunity to do so. Instead, around 11:57, Bennett called the rental company—Enterprise—which confirmed Buford was not an authorized driver and, as Bennett predicted, advised Bennett that it would take possession of the truck.

In checking Buford's status with the rental car company, Bennett was performing a task related to the traffic stop. As such, any delays resulting from that task did not require additional reasonable suspicion.  The Eighth Circuit has repeatedly held:

> [I]f a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. Occupants . . . may be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. These tasks can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. The officer may also ask questions about the occupant's travel itinerary.

*United States v. Gunnell,* 775 F.3d 1079, 1083-84 (8th Cir. 2015) (quoting *United States v. Ovando–Garzo,* 752 F.3d 1161, 1163 (8th Cir. 2014)).

However, once Bennett confirmed Buford's status and Enterprise's decision to reclaim possession of the truck, he further delayed the stop by, in effect, asking Enterprise to wait for fifteen to twenty minutes for him to call back before they came to pick up the truck. Bennett made this request because he had already called for a drug dog and wanted to wait until the dog sniff had been conducted before Enterprise arrived to take possession of the truck. In *Rodriguez v. United States,* the Supreme Court held that, unlike routine tasks such as checking a driver's license, a dog sniff is not an ordinary incident of a traffic stop. 135 S. Ct. 1609, 1615 (2015). It

15

"is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (internal quotation marks omitted). Because it lacks the same close connection to roadway safety as ordinary traffic stop inquiries such as the validity of a driver's license, proof of insurance, and automobile registration, a dog sniff is "not fairly characterized as part of the officer's traffic mission." *Id.* During an otherwise lawful traffic stop, an officer may conduct certain inquiries, like a dog sniff, that are unrelated to the traffic stop; however, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* As such, any delay resulting from Bennett's decision to conduct a dog sniff must have been supported by probable cause or reasonable suspicion to avoid running afoul of the Fourth Amendment.

### 2. *Bennett had reasonable suspicion to briefly detain Buford to conduct the dog sniff*

The Eighth Circuit has repeatedly held that an officer may "expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). *See also United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (officer has justification for intrusion unrelated to the traffic offense if "during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband"). To avoid violating the Fourth Amendment, however, the officer's suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Jones,* 269 F.3d 919, 927 (8th Cir. 2001) (quoting *United States v. Beck,* 140 F.3d 1129, 1136)) (8th Cir. 1998)). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry v. Ohio,* 392 U.S. 1, 27 (1968) (internal quotation marks omitted). In

16

determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *Jones,* 269 F.3d at 927. The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which describe a very large category of presumably innocent travelers." *Id.* (internal quotation marks omitted) (quoting *Reid v. Georgia,* 448 U.S. 428, 441 (1980)).

In this case, the collective facts and circumstances known by Bennett when he decided to call for a drug sniffing dog, coupled with Bennett's experience as a highway patrolman, establish reasonable suspicion to detain Buford until a dog sniff was performed. As the foregoing factual findings reflect, before his encounter with Buford, Bennett had experience as a highway patrolman with narcotics investigations. By the time Bennett called for a drug dog, Bennett had discovered that Buford, the sole occupant of the truck, was not the person on the rental agreement; the person Buford identified as the renter of the truck was also not listed on the rental agreement; according to the rental agreement, the truck had been due back to Enterprise Leasing two months earlier; and Buford was "not sure" if he was an authorized driver.

Although Buford provided a seemingly innocent explanation for the discrepancies related to the rental agreement, Bennett testified that the third-party rental issue coupled with Bennett's experiences with drug interdictions as a highway patrolman and Bennett's other observations led Bennett to grow suspicious that Buford might be engaged in criminal activity. According to Bennett, the other observations that fed his suspicion included Buford's slower-than-traffic speed as he drove past the patrol car; Buford's position in the driver's seat which concealed his face

17

from Bennett; the strong fragrance of air freshener in a very clean truck cab; Bennett's belief that Buford was traveling from a source city for narcotics; and Buford's excessive nervousness. Bennett's testimony that Buford appeared to be excessively nervous was not completely borne out by the video recording, although the undersigned acknowledges that Bennett, who was present with Buford at the time, would have been far better able to observe shallow breathing and other hallmarks of nervousness. With this one exception, the undersigned found Bennett's testimony regarding his observations prior to the traffic stop and subsequent interactions with Buford to be credible and, as indicated in the factual findings, largely supported by the video recording of that interaction.

Buford appears to argue that because he had an innocent explanation for discrepancies related to the third-party rental that were later verified by Enterprise, Bennett lacked reasonable suspicion. However, at the time Bennett decided to call for the drug dog, he had not spoken with anyone at Enterprise. All he knew at that point was that there was a discrepancy, that Buford had an explanation for the discrepancy, and that Buford was "not sure" if he was an authorized driver. Buford also seems to argue that Bennett's suspicion lacks the specificity demanded by the Fourth Amendment because, according to Bennett, virtually every large metropolitan area qualifies as a source city for narcotics and things like nervousness and strong air freshener could be attributable to countless innocent people who encounter police. Buford contends the facts of this case are analogous to the facts in *United States v. Chaney,* 192 F.Supp.3d 992 (E.D. Mo 2016), in which the undersigned found that a highway patrol officer lacked reasonable suspicion to extend an otherwise lawful traffic stop. In concluding that the officer in *Chaney* lacked reasonable suspicion, the undersigned reasoned:

> The circumstances surrounding this traffic stop simply do not bear the hallmarks of a case in which reasonable suspicion of narcotics

18

>possession or any other criminal activity exists. Other than the fact that Clark was speeding, nothing about the traffic-related investigation suggested that anything was amiss. Clark's driver's license was valid and she had no outstanding warrants. ***The vehicle was neither stolen nor a rental that had been rented by someone who was not present.*** The vehicle registration check confirmed that the vehicle was owned by Chaney who was present in the vehicle.
>
>Indeed, this case is most striking for what facts are not present. In stark contrast to cases in which reasonable suspicion of drug activity has been found, here, there ***is no evidence that Trooper Johnson was patrolling a known drug trafficking route or that Clark and Chaney and the others were coming from or heading to a city known for narcotics trafficking***. Nor is there any evidence that Trooper Johnson had some prior knowledge or warning via a bulletin, police alert, or informant that would cause him to be on the lookout for four people in a Volvo heading in the direction of Chicago, Illinois or coming from the Kansas City area. ***There is also no evidence that Trooper Johnson smelled the odor of any drug or alcohol or excessive fragrance that could mask the odor of those substances*** either on Clark or in Chaney's vehicle.
>
>Trooper Johnson's testimony that it is "***hard to determine what [he] suspected***" when he decided to call for a drug sniffing dog is very telling.

*Id.* at 1012-13 (emphasis added) (internal citations omitted).

Unlike *Chaney,* this case ***does*** involve a vehicle rented by someone who was not present. Unlike *Chaney,* this case also involves testimony by the officer, who had some experience with narcotics trafficking along Interstate 55, that the defendant was coming from a city known for narcotics trafficking and the officer observed excessive fragrance in the car that could mask the odor of narcotics. Finally, unlike the officer in *Chaney*, who testified that it was "hard to determine what [he] suspected," the officer in this case was able to articulate in a very specific way what he suspected and why he suspected it.

For the foregoing reasons, the undersigned concludes that Trooper Bennett did not violate the Fourth Amendment when he detained Buford for the purpose of conducting a dog sniff of

19

Buford's rental truck.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Alfred Buford's Motion to Suppress Physical Evidence (Doc. 28) be **DENIED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

**IT IS HEREBY ORDERED**, pursuant to the Administrative Order of this Court, that the case be assigned to a district judge for trial or further disposition.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of August, 2020.